Benjamin Richard Botts (SBN 274542)
ben@cdmigrante.org
Melanie A. Stratton (North Carolina SBN 56219)
(*pro hac vice* forthcoming)
melanie@cdmigrante.org
CENTRO DE LOS DERECHOS DEL MIGRANTE, INC.
711 W 40th Street, Suite 412
Baltimore, MD 21211
Telephone: +1 855 234 9699

Christopher T. Casamassima (SBN 211280)
chris.casamassima@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Avenue, Suite 2100
Los Angeles, CA 90071
Telephone: +1 213 443 5374

(Additional counsel listed on next page)

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENGRACIA HERNÁNDEZ-GARCÍA,<br><br>*Plaintiff,*<br><br>v.<br><br>ISAAC PENHOS DANA, ESTER SUTTON DE SACAL, SAMUEL PENHOS, ALICIA SACAL DE PENHOS,<br><br>*Defendants.* | Case No.: **'21 CV 1673 JAH KSC**<br><br>**COMPLAINT FOR:**<br>**(COUNTS 1-4) TRAFFICKING VICTIMS PROTECTION ACT;**<br>**(COUNT 5) CA TRAFFICKING VICTIMS PROTECTION ACT;**<br>**(COUNT 6) FAIR LABOR STANDARDS ACT;**<br>**(COUNTS 7, 9-13) CA LABOR CODE;**<br>**(COUNTS 7, 9-11) IWC WAGE ORDER 15;**<br>**(COUNT 7) GENERAL. MIN. WAGE ORDER;**<br>**(COUNTS 8-9) SAN DIEGO MUNICIP. CODE;**<br>**(COUNT 14) BREACH OF CONTRACT;**<br>**(COUNT 15) CA BUS. & PROF. CODE**<br>**(COUNT 16) UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

COMPLAINT
Case No.

Andrew Shipley (District of Columbia SBN 1010836)
(*pro hac vice* forthcoming)
andrew.shipley@wilmerhale.com
Leslie A. Harrelson (District of Columbia SBN 998186)
(*pro hac vice* forthcoming)
leslie.harrelson@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Telephone: +1 202 663 6283

Chavi Keeney Nana (New York SBN 4810362)
(*pro hac vice* forthcoming)
chavi.nana@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: +1 212 230 8800

*Attorneys for Plaintiff*

ACTIVEUS 189746757v.4

# COMPLAINT

Plaintiff Engracia Hernández-García ("Ms. Hernández-García" or "Plaintiff") brings this action against Defendants Samuel Penhos and Alicia Sacal de Penhos (together, the "Penhos Defendants"), as well as Defendants Isaac Penhos Dana and Esther Sutton de Sacal (collectively, "Defendants"), and alleges as follows:

## I.    INTRODUCTION

1.    Ms. Hernández-García devoted seven years of her life to the Penhos Defendants as a domestic worker in the United States for little to no compensation. Defendants induced Ms. Hernández-García to leave Mexico with false promises regarding the terms and working conditions of her employment in the United States. Defendants worked together to ensure Ms. Hernández-García's continued service by socially and physically isolating her, requiring her to work long hours in a tense and sometimes violent household while paying her less than half the minimum wage, without overtime pay, and for far less than she was contractually owed.  To exert control over Ms. Hernández-García, Defendants threatened her with deportation, confiscated her passport and visa for long periods (and continue to hold it to this day) and limited her ability not to just leave the country, but to even leave the house where she was confined in a traumatic working and living environment.

2.    Ms. Hernández-García, a citizen of Mexico, brings this action to recover damages under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA") for injuries inflicted by Defendants.  Ms. Hernández-García also asks this Court to vindicate her rights to fair and reasonable remuneration under the Fair Labor Standards Act ("FLSA"), the California Labor Code, the California Unfair Competition Law, the San Diego Municipal Code, and the common law of the State of California.

## II.    SUBJECT MATTER JURISDICTION AND VENUE

3.    This Court has original subject matter jurisdiction pursuant to 18 U.S.C. § 1595 (TVPRA) and 29 U.S.C. § 216(b) (FLSA).

COMPLAINT
Case No.

4.     This Court has supplemental jurisdiction over the related state law claims under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over these claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

### III.   PARTIES

5.     Plaintiff Engracia Hernández-García is a Mexican citizen and identifies as an indigenous woman.   She is a monolingual Spanish speaker and has an elementary-school education.   Ms. Hernández-García worked for the Penhos Defendants and resided in their home, first in Miami, Florida, and then at 6617 Muirlands Drive, La Jolla, California, between 2012 and 2019.

6.     Defendant Samuel "Sammy" Penhos has resided at or has owned 6617 Muirlands Drive, La Jolla, California, from 2012 to present.   Defendant Sammy Penhos employed Ms. Hernández-García in the State of California from approximately August 2012 until June 2019.   At all relevant times, Defendant Sammy Penhos was Ms. Hernández-García's employer pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*, the California Labor Code, § 1182.12, Industrial Wage Commission ("IWC") Wage Order #15, and San Diego Mun. Code § 39.0104.

7.     Defendant Alicia Sacal de Penhos has resided at or has owned 6617 Muirlands Drive, La Jolla, California, from 2012 to present.   Defendant Alicia Sacal de Penhos employed Ms. Hernández-García in the State of California from approximately August 2012 until June 2019.   At all relevant times, Defendant Alicia Sacal de Penhos was Ms. Hernández-García's employer pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*, the California Labor Code, § 1182.12, IWC Wage Order #15, and San Diego Mun. Code § 39.0104.

8.     Defendant Isaac Penhos Dana resides in Mexico City, Mexico.   On information and belief, he regularly travels to the United States to conduct business. At all relevant times, Defendant Isaac Penhos Dana was Ms. Hernández-García's

employer pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*, the California Labor Code, § 1182.12, IWC Wage Order #15, and San Diego Mun. Code § 39.0104.

9.    Defendant Esther Sutton de Sacal resides in Mexico City, Mexico, and, on information and belief, resides at either 19667 Turnberry Way Apt 2, Miami, Florida 33180-2593 or 1820 Avenida del Mundo, Coronado, California 92118-3003 when in the United States.  At all relevant times, Defendant Esther Sutton de Sacal was Ms. Hernández-García's employer pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*, the California Labor Code, § 1182.12, IWC Wage Order #15, and San Diego Mun. Code § 39.0104.

## IV.    PERSONAL JURISDICTION

10.    This Court has personal jurisdiction over the Penhos Defendants because they are residents of California.

11.    This Court has personal jurisdiction over Defendant Esther Sutton de Sacal because of her systematic and continuous contacts with the State of California, including part-time residency in California and because a substantial part of the wrongful acts alleged in this Complaint were committed in California, including obtaining and maintaining Ms. Hernández-García's labor and services through threatened abuse and abuse of the legal process in violation of 18 U.S.C. § 1589 and related statutes.  The court can reasonably exercise personal jurisdiction over Defendant Sutton de Sacal because she has availed herself of the privileges of employing a domestic worker in California and conducting activities in California, and because Plaintiff's claims arise out of these activities within California.

12.    This court has personal jurisdiction over Defendant Isaac Penhos Dana because of his systematic and continuous contacts with the State of California and because a substantial part of the wrongful acts alleged in this Complaint were committed in California.  On information and belief, Defendant Penhos Dana also regularly transacts business in California.  Because Defendant Penhos Dana has availed himself of the privileges of employing a domestic worker in California, and

-3-

because Plaintiff's claims arise out of these activities within California, the exercise of personal jurisdiction over Defendant Penhos Dana is reasonable.

13.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (1) substantially all of the events giving rise to the claims in the Complaint occurred in the Southern District of California; (2) the Penhos Defendants reside in the Southern District of California; and (3) Defendant Esther Sutton de Sacal resides in the Southern District of California when in the United States.

## V.   STATEMENT OF FACTS

### A.   Plaintiff's Recruitment in Mexico

14.  In or around late January or early February 2012, Ms. Hernández-García met with Defendant Esther Sutton de Sacal in Mexico City, Mexico.  At this meeting, Defendant Esther Sutton de Sacal explained that she was acting on behalf of the Penhos Defendants and offered Ms. Hernández-García a position as a domestic worker for the Penhos Defendants in the United States.  Defendant Esther Sutton de Sacal said at this initial meeting that Ms. Hernández-García would earn 12,000 pesos per month and described the work as light.

15.  Defendant Esther Sutton de Sacal told Ms. Hernández-García that she would earn a lot of money.   Plaintiff did not know the exchange rate between the dollar and the peso at the time or the value of a dollar and trusted Defendant Esther Sutton de Sacal's representation.  A monthly salary of 12,000 pesos would have been about $900 at 2012 exchange rates.

16.  When Ms. Hernández-García explained that she supported her three sons, who were then aged 9, 19, and 22, and her ill, widowed mother, Defendant Esther Sutton de Sacal replied that this was an opportunity to get ahead and that Ms. Hernández-García would not have an opportunity to earn as much working in Mexico, where she was earning approximately 3,800 pesos biweekly.

17.  Defendant Esther Sutton de Sacal explained that Ms. Hernández-García would receive a contract for her employment.

-4-

ACTIVEUS 189746757v.4

18.    Ms. Hernández-García believed Defendant Esther Sutton de Sacal's representations concerning her prospective employment for the Penhos Defendants. Based upon these assurances, Ms. Hernández-García gave up her previous job working as a domestic worker in Mexico, asked Defendant Esther Sutton de Sacal to proceed in arranging a contract, and prepared to move to the United States.

19.    While waiting for the necessary travel arrangements to be made between February and April 2012, Ms. Hernández-García was employed as a live-in domestic worker by Defendant Esther Sutton de Sacal in her Mexico City home. Ms. Hernández-García cleaned and cooked from approximately 8 a.m. to 10 p.m. each day, averaging 14-hour days with only one break during the day between 3 and 4 p.m. She worked every day of the week and had only every second weekend off. Ms. Hernández-García earned 2,500 pesos (about $190 USD) in cash per two-week period.  She shared a room in Defendant Sutton de Sacal's house with another live-in domestic worker.

20.    Defendant Esther Sutton de Sacal made the arrangements for Ms. Hernández-García to apply for and obtain a Mexican passport.

21.    Defendant Sutton de Sacal also made the arrangements for Ms. Hernández-García to apply for and obtain a B-1 visa so that Ms. Hernández-García could live and work in the United States.

22.    Defendant Isaac Penhos Dana served as Ms. Hernández-García's B-1 visa sponsor when she applied for her first B-1 visa, and again each year when she renewed her B-1 visa.  Defendant Isaac Penhos Dana provided bank statements as supporting documentation for Ms. Hernández-García's B-1 visa.

23.    Sometime between February and April 2012, Ms. Hernández-García traveled from Defendant Esther Sutton de Sacal's home, where she was working at the time, to the U.S. Embassy in Mexico City for her visa interview.  The Embassy granted the B-1 visa on April 4, 2012.

-5-

COMPLAINT
Case No.

24.     Each year, Defendant Penhos Dana signed a labor contract that was submitted along with the B-1 visa application, identifying himself as Ms. Hernández-García's employer.  The annual contracts varied, but, upon information and belief, stipulated that Ms. Hernández-García would earn the highest of the federal, state, or local minimum wage.  Between 2012 and 2019, the promised salary ranged between $7.67 and $13.43 per hour.  Among other benefits, the annual contracts also stated that Defendant Penhos Dana would pay Ms. Hernández-García 150% of the stated hourly wage for every hour in excess of 40 hours per week, and would cover the costs of health insurance, travel, and room and board.  Later annual contracts also stated that Ms. Hernández-García would work Monday to Friday from 9 a.m. to 5 p.m., for a 40-hour workweek.

25.     The contracts were read to Ms. Hernández-García by Defendant Penhos Dana's family lawyer without additional explanation.  She saw the hourly salary in dollars but did not know and was not told how it translated into pesos.  Over time, Ms. Hernández-García learned that the dollar was stronger than the peso and started to wonder whether she was being paid fairly for the work that she did for the Penhos Defendants.

26.     Ms. Hernández-García feared Defendants' reaction if she openly questioned her rate of pay and felt that she had no other choice but to continue working for Defendants, so she went on working for them until 2019, when they unilaterally terminated her engagement.

**B.    Plaintiff's Employment in the United States**

27.     On or around April 13, 2012, after Ms. Hernández-García received her B-1 visa, Defendant Isaac Penhos Dana brought her from Mexico City to Miami, Florida.

28.     Defendant Isaac Penhos Dana brought Ms. Hernández-García into the United States every time she returned after her visa renewal.  Upon arriving at the airport, he took possession of her passport, which contained her B-1 visa, instructing

-6-

ACTIVEUS 189746757v.4

her to handle the baggage, and insisted on speaking to the border patrol agents on her behalf.

29.     Upon arrival, he introduced her to the Penhos Defendants, who were then living in Miami.  Ms. Hernández-García worked for the Penhos Defendants in Miami for four months.

30.     On or around August 20, 2012, Ms. Hernández-García moved with the Penhos Defendants to San Diego, California, where she lived for the remainder of her employment with Defendants.

31.     Ms. Hernández-García last effective day working for the Penhos Defendants was on or around June 25, 2019.

32.     Throughout her employment, Ms. Hernández-García regularly worked well over 40 hours per week and earned far less than the promised hourly wage in her annual contracts, as well as the applicable minimum wage.

33.     Although Defendant Sutton de Sacal had promised Ms. Hernández-García that she would be responsible for cleaning and some occasional childcare, Ms. Hernández-García was actually responsible for cleaning, cooking, and round-the-clock childcare.  In particular, she was responsible for caring for the Penhos Defendants' son.

34.     The Penhos Defendants required Ms. Hernández-García to work from 6:00 a.m. to 8:00 p.m. Monday to Saturday and until 11:00 p.m. or 1:00 a.m. several times a month.  She often had to work later than 8:00 p.m. during the week, when the Penhos Defendants went out and she had to babysit the children until around 11 p.m.  Occasionally, she also had to work on Sundays.  While promised a daily two-hour break, in practice Ms. Hernández-García often spent her break taking care of the Penhos Defendants' son, who required constant supervision.

35.     In the periods between 2012 and 2017 and between January and June 2019, Plaintiff Hernández-García worked an average of 90 hours per week, generally

COMPLAINT
Case No.

spending her daily break (4:00 p.m. to 6:00 p.m.) watching their son, per the Penhos Defendants' instructions.

36.     Between August 2017 and January 2019, Ms. Hernández-García was unable to regularly take the breaks to which she was entitled because even though the son was at boarding school, she was often instructed to do housework during these breaks.  Despite occasional breaks, Plaintiff still worked an average of 76 hours per week.

37.     The Penhos Defendants provided Ms. Hernández-García with very little food and she often went hungry.  When the Penhos Defendants left on vacation, they expected Ms. Hernández-García to be in the house but left her no food and did not pay her for her time.

38.     Defendant Esther Sutton de Sacal once made Ms. Hernández-García throw away a barely eaten sandwich discarded by one of the Penhos Defendants' children.  Ms. Hernández-García later retrieved the sandwich from the garbage and ate it because she was so hungry.

39.     From 2012 to 2014, the Penhos Defendants paid her a flat $350 weekly wage, regardless of her hours worked.  From 2014 to 2019, the Penhos Defendants paid Ms. Hernández-García a flat rate of $400 per week, regardless of her hours worked.

40.     The Penhos Defendants told her that they would not pay her more than $400 per week because they had two domestic workers.  Ms. Hernández-García was afraid that they would be angry if she requested another raise or told others that she was being underpaid.

**C.     Plaintiff's Working Conditions in Miami, Florida**

41.     Ms. Hernández-García worked for the Penhos Defendants in Miami, Florida, from April to August 2012.

42.     During her time in Miami, Ms. Hernández-García was responsible for cleaning the Penhos Defendants' three-bedroom, three-bathroom apartment,

-8-

COMPLAINT
Case No.

cooking all of the family's meals, and acting as the children's primary caretaker. This included getting the kids ready for school or tutoring, accompanying the kids to extracurricular activities, and watching the kids on evenings when the Penhos Defendants were out of the house.

43. Ms. Hernández-García had to work quickly and without breaks, to keep up with the demands of the Penhos Defendants. For example, although Ms. Hernández-García was expected to wash and iron clothes and linens on a daily basis, she had to schedule these chores around the family's meals, since each person ate on a different schedule. She was also expected to care for the children throughout the day, until their bedtime, at which point she was permitted to finish any remaining work and go to sleep.

44. Despite the long hours worked and meager pay, Defendant Alicia Sacal de Penhos regularly complained that Ms. Hernández-García was not working enough and was overpaid.

45. During this time, Ms. Hernández-García was required to share a bedroom and bathroom with the Penhos Defendants' son. Although she had her own bed, Ms. Hernández-García was given no personal space for her belongings and had to store them below the bathroom sink. She had no privacy and effectively had to attend to the son at all times, as he grew increasingly dependent upon her.

46. Ms. Hernández-García often went to sleep hungry while living in Miami, because she was not allowed to eat the family's food and had limited access to an affordable grocery store to buy her own food.

**D.    Plaintiff's Working Conditions in San Diego, California**

47. In August 2012, the Penhos Defendants moved from Miami, Florida, to San Diego, California, where Ms. Hernández-García worked for them between August 2012 to June 2019.

48. In San Diego, Ms. Hernández-García had the same work schedule and received the same flat fee compensation, but her job duties changed slightly. Ms.

-9-

Hernández-García was responsible for cleaning the Penhos Defendants' large home, a sprawling 5,100 square foot gated property, with several bedrooms and bathrooms. Although the Penhos Defendants hired a cook in San Diego, Ms. Hernández-García was expected to assist the cook and serve all three meals per day.  She remained responsible for taking care of the Penhos Defendants' children, including getting them ready for school and accompanying them to after-school activities.  Ms. Hernández-García did the family's grocery shopping approximately twice a month.

49.    In San Diego, Ms. Hernández-García shared a room and bathroom with the cook.  This bathroom was also used as a guest bathroom.  When the Penhos Defendants had houseguests over, they prohibited Ms. Hernández-García from using this bathroom and she had to wait until the guests left to relieve herself.

50.    When the Penhos Defendants went out of town, they required Ms. Hernández-García to stay with the children at Defendant Esther Sutton de Sacal's home in Coronado, California.  During these periods, Ms. Hernández-García was forced to labor for Defendant Esther Sutton de Sacal.

**E.    Plaintiff's Fear of Defendants**

51.    Defendants knew that Ms. Hernández-García was the primary breadwinner for her ailing mother and three sons, and that she had given up other employment in Mexico to work for Defendants, and they used this knowledge to exert control over Ms. Hernández-García.  For example, Defendant Sacal de Penhos constantly demanded that Ms. Hernández-García work harder and faster while claiming she was overpaid, making Ms. Hernández-García feel afraid that she would lose her job and be unable to provide for her family.

52.    Just a few months after starting work for Defendants, in or around June 2012, Defendant Esther Sutton de Sacal threatened to have Ms. Hernández-García deported, after Ms. Hernández-García was harshly accused of leaving the Penhos Defendants' children unsupervised for a brief time, due to a miscommunication between Defendant Esther Sutton de Sacal and the Penhos Defendants' children.

-10-

ACTIVEUS 189746757v.4

Ms. Hernández-García believed that Defendants had the power to have her deported, and after this traumatic event, she was constantly fearful that any mistake could lead to her deportation.

53.     This is not the only time Ms. Hernández-García was threatened.  On one occasion, Defendant Alicia Sacal de Penhos told Ms. Hernández-García that child neglect was a serious crime in the United States and said she could call the police and have Ms. Hernández-García taken away if she did not constantly supervise the Penhos Defendants' children.  Ms. Hernández-García understood this to be another threat of deportation.

54.     Ms. Hernández-García was so afraid of deportation that she became hypervigilant about meeting Defendants' every demand for the remainder of her time working for them.  For example, she canceled or delayed routine, preventative medical care and even worked while sick to try to appease Defendants' expectations.

55.     Additionally, the Penhos Defendants isolated Ms. Hernández-García in their home and limited her freedom of movement, especially Defendant Samuel Penhos.  Ms. Hernández-García was afraid that if she defied their orders to stay home she would be fired, locked out of the house, or accused of stealing something if she left without permission, and would ultimately be deported back to Mexico or suffer other adverse immigration consequences.

56.     Given the ever-present threat of deportation hanging over her head, Ms. Hernández-García also had reason to fear Defendants due to the culture of violence and impunity in Mexico.  As the Inter-American Commission on Human Rights reports, "the human rights situation in Mexico in recent years has revealed more reports of disappearances and forced disappearances, extrajudicial executions, and torture, as well as a deterioration of citizen insecurity, the lack of access to justice, and impunity."  Inter-American Commission on Human Rights, The Human Rights Situation in Mexico, Doc. 44/15, ¶ 14 (2015).  Even as homicide and extrajudicial killings have increased, "the vast majority of these crimes go unpunished."  *Id.* ¶

-11-

198. "The threats, harassment, murders, and disappearances of individuals seeking truth and justice have had the effect of intimidating Mexican society . . . creating a serious problem of underreporting." *Id.* ¶ 30.  As a result of this situation and given Defendants' ties to Mexico, Ms. Hernández-García feared Defendants' power to harm her or her family members in Mexico with impunity.

**F.** ███████████████████████████

57. ████████████████████████████████

████████████████████████████████████

███████████████████████████████

58. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████

59. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

60. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████

**G.** ██████████████████████████████

███████████████

61. ████████████████████████████████

███████████████

COMPLAINT
Case No.

ACTIVEUS 189746757v.4

62.



63.

64.

65.

66.

COMPLAINT
Case No.

ACTIVEUS 189746757v.4



-14-

## H.    Plaintiff's Isolation in the San Diego House

73.    The Penhos Defendants closely controlled Ms. Hernández-García's movements outside of the home—monitoring her activities, dictating where she ran errands, and ensuring she had only enough cash to acquire the items they specified.

74.    Unless it was her day off, Ms. Hernández-García could leave the house only if accompanied by a family member or in an Uber that Defendant Alicia Sacal de Penhos ordered.

75.    The Penhos Defendants justified these control measures by telling Ms. Hernández-García that she had nowhere to go and that she was needed at home to watch the house and the children.

76.    The rare exception to Ms. Hernández-García's forced isolation in the Penhos Defendants' home was when they permitted her to attend church on Sundays. However, to do so she had to walk to the bus stop where she could catch the bus that would drop her off near her church, as the Penhos Defendants refused to provide her with any other means of transportation.  In order to actually attend church, Ms. Hernández-García had to sneak out of the house because if the Penhos Defendant's son knew she was home, he would demand that Ms. Hernández-García take care of him.

## I.    Defendants' Control over Plaintiff's Passport and Visa

77.    Over the course of the seven years she worked in the United States, Ms. Hernández-García was almost wholly deprived of access to her Mexican passport and B-1 visa.

78.    In the course of recruiting her to work for the Penhos Defendants in 2012, Defendant Ester Sutton de Sacal made the arrangements for Ms. Hernández-García to apply for and obtain a Mexican passport.

79.    Upon Ms. Hernández-García's arrival in the United States in 2012, Defendant Isaac Penhos Dana confiscated her passport and visa before delivering it to the Penhos Defendants, who held it while she was working in the United States.

-15-

COMPLAINT
Case No.

80.     From 2012 to 2018, Defendant Esther Sutton de Sacal and the Penhos Defendants wrongfully maintained continuous control over Ms. Hernández-García's passport and visa, claiming that they owned it because they had paid for it.

81.     Once a year, the Penhos Defendants would lend Ms. Hernández-García her passport on a temporary basis—just long enough for her to re-enter Mexico so that she could renew her visa.  Once she passed through customs upon entry into Mexico, Defendant Esther Sutton de Sacal would re-confiscate the passport.  She would return it so that Defendant Isaac Penhos Dana could bring Ms. Hernández-García back over the border into the United States.  During transit, Defendant Isaac Penhos Dana held Ms. Hernández-García's passport and communicated with border agents on her behalf.  Upon arrival to the United States, the Penhos Defendants would re-confiscate her passport and visa, usually before exiting the airport.

82.     In or around summer 2018, the Penhos Defendants returned Ms. Hernández-García's passport for a few months to forestall any immigration enforcement risks.  Ms. Hernández-García was aware of several U.S. Immigration and Customs Enforcement ("ICE") raids taking place in or around San Diego and begged the Penhos Defendants to return her passport so she would have proof of her immigration status.

83.     The Penhos Defendants re-confiscated the passport and visa after Ms. Hernández-García returned to the United States from her annual visa renewal trip to Mexico in January 2019.

84.     In June 2019, in the process of terminating Ms. Hernández-García's employment with Defendants, Defendant Alicia Sacal de Penhos escorted Ms. Hernández-García to Tijuana, Mexico, from San Diego, California.  During their travel, Defendant Alicia Sacal de Penhos had possession of Ms. Hernández-García's passport and visa.  Upon arriving at Defendant Esther Sutton de Sacal's home in Mexico, Defendants retained control of Ms. Hernández-García's passport.  Upon

COMPLAINT
Case No.

information and belief, Defendant Esther Sutton de Sacal and/or Defendant Alicia Sacal de Penhos are still in possession of Ms. Hernández-García's passport.

## J.    Defendants' Failure to Adhere to Their Statutory and Contractual Obligations to Plaintiff

85.    Despite promises made at the time of her recruitment, the Penhos Defendants paid Ms. Hernández-García only $350 to $400 per week while she worked an average of 76 to 90 hours per week for them.  Thus, Plaintiff's hourly wage ranged between approximately $3.88 and $5.26 over the course of her employment, far below the applicable state and local minimum wages which ranged from $7.67 per hour to $12 per hour during the same period.

86.    For the entire time she was employed by the Penhos Defendants, Ms. Hernández-García was paid in cash and did not receive any pay stubs, written statements, or other receipts showing her hours worked, wages earned, and any deductions from her pay.

87.    Plaintiff's annual work contracts committed Defendant Penhos Dana to pay federal, state, and local taxes, as well as medical expenses, medical and other insurance, sick leave, travel expenses, and room and board.  The annual contracts stated that these expenses could not be deducted from Ms. Hernández-García's salary.

88.    Of these contractually agreed-upon benefits, Ms. Hernández-García received only partial provision of her travel expenses, a fraction of her promised wages, a room that she first had to share with the Penhos Defendants' son and then another worker, and virtually no board.  Ms. Hernández-García also incurred expenses of approximately $10-15 per week of her own money to pay for food or drinks for the children when she was out of the house with them.  Defendants did not reimburse her for these expenses.

89.    Between 2012 and December 2018, Ms. Hernández-García had to pay for the majority of her own food.

COMPLAINT
Case No.

90.    Of her other contractual benefits, Ms. Hernández-García received no health care or other insurance coverage, her medical expenses were not paid, and she received no sick days.

91.    Even while ill with the flu, Ms. Hernández-García was not allowed a sick day.  She worked a full day as usual, napping only briefly for 10 minutes, when her roommate, the family cook, covered for her.

92.    During her entire employment, Defendants never provided Ms. Hernández-García with an insurance card or information on available health insurance options.

93.    The Penhos Defendants denied Plaintiff the ability to obtain routine preventive care because the doctor's office hours coincided with her working hours. For example, Defendant Sacal de Penhos twice refused Ms. Hernández-García's request to get a mammogram and gynecological care because the appointments would take her away from her work.  Ms. Hernández-García was eventually able to schedule a mammogram, but only after she found low cost and free health care services because the Penhos Defendants refused to provide any health care benefits. Ms. Hernández-García either walked or paid for her own transportation to her medical appointments.

94.    Ms. Hernández-García was also forced to delay treatment for a severe toothache until her annual visa renewal trip to Mexico because the Penhos Defendants would not allow her time away from work in order to have a dental examination in the United States.

95.    Defendants had the means to compensate Ms. Hernández-García in accordance with the terms of her annual employment contracts, but they willfully refused to do so.  Instead, Defendants knowingly and deliberately breached their employment contracts with Plaintiff and violated applicable wage law, trusting that Plaintiff's isolation, immigration status, and financial obligations would immunize them from any adverse consequences arising from their misconduct.

COMPLAINT
Case No.

**K.**     **Plaintiff's Coerced, Immediate Return to Mexico When Family Found Out Plaintiff Had Spoken to Immigration Lawyer**

96.     In late April 2019, Ms. Hernández-García met with a lawyer to discuss her immigration status.

97.     On or around June 18, 2019, Defendant Alicia Sacal de Penhos confronted Ms. Hernández-García about meeting with a lawyer, which Ms. Hernández-García denied for fear of reprisal from Defendants.  Defendant Sacal de Penhos also accused Ms. Hernández-García of complaining about her working conditions, which she also denied.

98.     On or around June 25, 2019, Defendant Esther Sutton de Sacal telephoned Ms. Hernández-García.  Defendant Sutton de Sacal told Ms. Hernández-García that the family planned to obtain a tourist visa for her and instructed her to pack a suitcase and be ready to leave within the hour.  Defendant Sutton de Sacal told Ms. Hernández-García that she had to leave right away for Mexico to start her application.

99.     Ms. Hernández-García complied, packing a small bag and leaving the rest of her belongings in the Penhos Defendants' San Diego home, believing that she would soon return.

100.     On or around June 25, 2019, the same day Ms. Hernández-García received the phone call from Defendant Esther Sutton de Sacal, Defendant Alicia Sacal de Penhos escorted Ms. Hernández-García across the border to the Tijuana airport and then flew with her to Mexico City where they met Defendant Esther Sutton de Sacal.  There, Defendant Sutton de Sacal confiscated Ms. Hernández-García's passport and B-1 visa, claiming that she needed them for the tourist visa application.

101.     Ms. Hernández-García never received a tourist visa and never had her passport or her B-1 visa returned.  After several attempts to communicate with Defendants Esther Sutton de Sacal, Isaac Penhos Dana, and the Penhos Defendants

-19-

ACTIVEUS 189746757v.4

about her pending visa application, Ms. Hernández-García realized that she had been misled and her employment terminated.

**L.      Psychological and Physical Trauma Suffered by Plaintiff**

102.    Defendants' blatant disregard for Plaintiff's well-being, manifested in their restricting her freedom of movement; subjecting her to near complete isolation and a climate of fear and violence; confiscating her travel documents; and continually violating her contractual and statutory rights, placed her under extreme emotional and physical duress.  She lived in a constant state of anxiety.  Her stress was compounded by her inability to obtain even a modicum of privacy.  Seven years of working long hours under these stressful and sometimes violent conditions with no sick leave, and no health care or health insurance took their toll on Ms. Hernández-García's mental and physical well-being.

103.    After leaving Defendants' employment, Ms. Hernández-García sought treatment for various injuries caused and/or exacerbated by the stress of her working conditions, including inflammation, abnormal weight gain and loss, frequent bouts of crying, anxiety, and depression.  Ms. Hernández-García continues to experience many of these symptoms.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION

ACT OF 2008 ("TVPRA")

FORCED LABOR, 18 U.S.C. § 1589

(*AGAINST DEFENDANT ESTHER SUTTON DE SACAL AND THE PENHOS DEFENDANTS*)

104.    Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

105.    Ms. Hernández-García brings this claim under 18 U.S.C. § 1595 of the Trafficking Victims Protection Reauthorization Act against the Penhos Defendants

-20-

ACTIVEUS 189746757v.4

and Defendant Esther Sutton de Sacal, who subjected her to forced labor in violation of 18 U.S.C. § 1589.

106.   After luring Ms. Hernández-García to the United States with false promises of humane working conditions, the Penhos Defendants and Defendant Esther Sutton de Sacal trapped her in a physically and emotionally abusive environment for subminimum wages, causing her physical, psychological, and financial harm, in order to obtain her labor in violation of 18 U.S.C. § 1589(a)(2).

107.   Defendants unlawfully obtained Ms. Hernández-García's labor through threatened abuse of law or legal process.   Defendant Esther Sutton de Sacal unlawfully obtained Ms. Hernández-García's labor when she threatened Ms. Hernández-García with deportation to compel her to take care of the children, in violation of 18 U.S.C. § 1589(a)(3).   Defendant Alicia Sacal de Penhos unlawfully obtained Ms. Hernández-García's labor when she threatened to call the police for child neglect to compel Ms. Hernández-García to take care of the children, in violation of 18 U.S.C. § 1589(a)(3).

108.   From 2012 to 2019, the Penhos Defendants and Defendant Esther Sutton de Sacal engaged in a scheme, plan, or pattern of behavior intended to cause Ms. Hernández-García to believe that she would suffer serious harm if she ceased to work for them, in violation of 18 U.S.C. § 1589(a)(4).

109.   The Penhos Defendants and Defendant Esther Sutton de Sacal also knowingly benefitted from their participation in a venture to obtain Plaintiff's labor and services as a domestic worker through the means described in paragraphs 107-108 above, while knowing or acting with reckless disregard that their venture was obtaining Plaintiff's labor by such means, in violation of 18 U.S.C. § 1589(b).

110.   Plaintiff suffered damages as a result of the above violations.

111.   As a result of the Penhos Defendants' and Defendant Esther Sutton de Sacal's actions, Ms. Hernández-García was forced to continue laboring and suffered damages, including emotional distress, humiliation, embarrassment, and lost wages.

-21-

ACTIVEUS 189746757v.4

Pursuant to 18 U.S.C. § 1595, Ms. Hernández-García is entitled to recover damages and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial, for their wrongful conduct.

## SECOND CLAIM FOR RELIEF

TRAFFICKING WITH RESPECT TO FORCED LABOR UNDER THE TVPRA, 18 U.S.C. § 1590

(*AGAINST DEFENDANTS*)

112. Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

113. Defendants Esther Sutton de Sacal and Isaac Penhos Dana recruited Ms. Hernández-García in Mexico and made the arrangements for Plaintiff's Mexican passport and B-1 visa so that she could labor for the Penhos Defendants in the United States. They misrepresented the terms of her employment and did not pay her or provide benefits in accordance with her annual contracts.

114. The Penhos Defendants obtained Ms. Hernández-García's labor as a result of the recruitment efforts of Defendants Esther Sutton de Sacal and Isaac Penhos Dana.

115. Working together, Defendant Sutton de Sacal and the Penhos Defendants trafficked Ms. Hernández-García for the purpose of obtaining and maintaining her forced labor, in violation of 18 U.S.C. § 1589. Consequently, these Defendants violated 18 U.S.C. § 1590(a).

116. As a result of Defendants' actions, Ms. Hernández-García was coerced into and forced to continue laboring for Defendants and suffered damages, including emotional distress, humiliation, embarrassment, and lost wages. Pursuant to 18 U.S.C. § 1595, Ms. Hernández-García is entitled to recover damages and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial, for Defendants' wrongful conduct.

-22-

ACTIVEUS 189746757v.4

### THIRD CLAIM FOR RELIEF

UNLAWFUL CONDUCT WITH RESPECT TO DOCUMENTS UNDER THE

TVPRA, 18 U.S.C. § 1592

(*AGAINST DEFENDANTS*)

117.  Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

118.  Defendants knowingly confiscated and maintained possession of Ms. Hernández-García's passport and visa throughout and after the period of her employment.  Defendant Esther Sutton de Sacal and Defendant Alicia Sacal de Penhos confiscated Ms. Hernández-García's passport and visa upon her most recent return to Mexico, and upon information and belief, still possess them.

119.  Defendants knowingly confiscated and maintained possession of Ms. Hernández-García's passport and visa in the course of subjecting her to forced labor under 18 U.S.C. § 1589 and trafficking with respect to forced labor under 18 U.S.C. § 1590, and "to prevent or restrict or to attempt to prevent or restrict, without lawful authority, [Ms. Hernández-García's] liberty to move or travel, in order to maintain [her] labor or services," in violation of 18 U.S.C. § 1592(a)(1) and (a)(3).

120.  Ms. Hernández-García suffered damages, including emotional distress, humiliation, embarrassment, and lost wages, as a result of Defendants' conduct. Pursuant to 18 U.S.C. § 1595, Ms. Hernández-García is entitled to recover damages, and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

### FOURTH CLAIM FOR RELIEF

KNOWINGLY BENEFITTING FROM LABOR TRAFFICKING UNDER THE

TVPRA, 18 U.S.C. § 1593A

(*AGAINST DEFENDANTS*)

121.  Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

-23-

ACTIVEUS 189746757v.4

122.   Defendants knowingly financially benefitted from participation in a venture "knowing or in reckless disregard of the fact that the venture" subjected Ms. Hernández-García to forced labor, 18 U.S.C. § 1589, and trafficking with respect to forced labor, 18 U.S.C. § 1590, and committed unlawful conduct with respect to documents in furtherance of trafficking, 18 U.S.C. § 1592, in violation of 18 U.S.C. § 1593A.

123.   Ms. Hernández-García suffered damages, including emotional distress, humiliation, embarrassment, and lost wages, as a result of Defendants' conduct. Pursuant to 18 U.S.C. § 1595, Ms. Hernández-García is entitled to recover damages, and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

### FIFTH CLAIM FOR RELIEF

HUMAN TRAFFICKING

(CALIFORNIA CIVIL CODE § 52.5)

(*AGAINST DEFENDANTS*)

124.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

125.   Defendants Esther Sutton de Sacal and Isaac Penhos Dana recruited Ms. Hernández-García in Mexico and made the arrangements for Plaintiff's Mexican passport and B-1 visa so that she could labor for the Penhos Defendants in the United States.  They misrepresented the terms of her employment and did not pay her or provide benefits in accordance with the terms of her annual contracts.

126.   Defendants obtained Ms. Hernández-García's labor as a result of the recruitment efforts of Defendants Esther Sutton de Sacal and Isaac Penhos Dana.

127.   Working together, Defendants trafficked Ms. Hernández-García for the purpose of obtaining and maintaining her forced labor, in violation of California Penal Code § 236.1(a).

128.   After obtaining Ms. Hernández-García's labor with false promises of

-24-

ACTIVEUS 189746757v.4

adequate compensation and humane working conditions, Defendant Esther Sutton de Sacal threatened Ms. Hernández-García with deportation.  Together with the Penhos Defendants, Defendant Sutton de Sacal also exercised strict control over and repeatedly confiscated Ms. Hernández-García's passport and visa.  The Penhos Defendants kept Ms. Hernández-García isolated in their volatile home.  Defendants' actions over a period of seven years caused Ms. Hernández-García to fear for her physical safety while working for the Penhos Defendants and to be concerned for the economic well-being of her family if she complained or left, in violation of California Penal Code § 236.1(a).

129.   As a result of Defendants' actions, Ms. Hernández-García was forced to continue laboring and suffered damages, including emotional distress, humiliation, embarrassment, and lost wages.  Pursuant to California Civil Code § 52.5, Ms. Hernández-García is entitled to recover damages and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial, for their wrongful conduct.

### SIXTH CLAIM FOR RELIEF

FAILURE TO PAY MINIMUM WAGE UNDER FAIR LABOR STANDARDS ACT ("FLSA")

(29 U.S.C. §§ 201 *ET SEQ.*)

(*AGAINST DEFENDANTS*)

130.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

131.   Defendants violated the provisions of the FLSA, 29 U.S.C. §§ 201 *et seq.*, by failing to pay Ms. Hernández García, a live-in domestic worker, the federal minimum wage.  29 U.S.C. § 206(f); 29 C.F.R. § 552.102.

132.   The federal minimum wage throughout Ms. Hernández-García's employment was $7.25 per hour.  29 U.S.C. § 206(a)(1).

133.   Defendants were Ms. Hernández-García's employers within the

COMPLAINT
Case No.

meaning of the FLSA.  29 U.S.C. § 203(d).

134.   Defendants were aware or should have been aware of the requirement to pay Ms. Hernández-García the statutorily defined minimum wage for her labor. Indeed, their initial work contract with Ms. Hernández-García specified that they would pay her the higher of federal minimum wage or the applicable state minimum wage.

135.   Defendants were aware that they were not paying Ms. Hernández-García the federal minimum wage because Defendants paid their other employees in the United States, including, their cook, a higher wage than Ms. Hernández-García.

136.   Defendants knowingly failed to pay Ms. Hernández-García the minimum wage for hours worked as required under federal law for her work in the Penhos Defendants' Florida and California homes.

137.   Defendants' failure to pay the minimum wage was willful.

138.   In addition, Defendants have not maintained and preserved payroll or other records documenting wages earned, hours worked, and rest periods taken by Ms. Hernández-García, in violation of the FLSA, under 29 C.F.R. § 516.2.

139.   As a result of Defendants' willful violations of the FLSA, under 29 U.S.C. § 216(b), Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, her unpaid wages, an additional equal amount in liquidated damages, and reasonable attorneys' fees and costs, including post-judgment interest (in the event there are no liquidated damages), in amounts to be proven at trial.

**SEVENTH CLAIM FOR RELIEF**

FAILURE TO PAY MINIMUM WAGE UNDER CALIFORNIA LABOR CODE

(CALIFORNIA LABOR CODE §§ 1182.11, 1182.12, 1194(A), 1194.2, 1197;

IWC WAGE ORDER #15; GENERAL MINIMUM WAGE ORDER)

(*AGAINST DEFENDANTS*)

140.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

-26-

ACTIVEUS 189746757v.4

141.   Under California Labor Code §§ 1182.11, 1182.12, 1194(a), 1194.2, 1197; IWC Wage Order #15; and the General Minimum Wage Order, Ms. Hernández-García was entitled to be paid a lawful minimum wage for all hours worked in Defendants' employ.

142.   Defendants were Ms. Hernández-García's employers within the meaning of California Labor Code, § 1182.12 and IWC Wage Order #15.

143.   During the period of Ms. Hernández-García's employment, the minimum wage in California ranged from $8 to $11 per hour.  California Labor Code § 1197.

144.   Defendants were aware of or should have been aware of the requirement to pay Ms. Hernández-García the statutorily defined minimum wage for her labor.

145.   Defendants knowingly failed to compensate Plaintiff at the wage rate prescribed by law at the relevant times.

146.   Defendants' failure to pay Ms. Hernández-García the minimum wage was willful.

147.   As a result of Defendants' willful violations of the California Labor Code, IWC Wage Order #15, and the General Minimum Wage Order, Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, her unpaid wages, liquidated damages, and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.  Cal. Labor Code §§ 1194, 1194.2.

## EIGHTH CLAIM FOR RELIEF

FAILURE TO PAY MINIMUM WAGE UNDER SAN DIEGO MUNICIPAL CODE

(SAN DIEGO MUNICIPAL CODE § 39.0107)

(*AGAINST DEFENDANTS*)

148.   Ms. Hernández-García re-alleges and incorporates each of the

-27-

ACTIVEUS 189746757v.4

foregoing paragraphs by reference.

149.   Under San Diego Municipal Code § 39.0107, Ms. Hernández-García was entitled to be paid a lawful minimum wage for all hours worked in Defendants' employ.

150.   Defendants were Plaintiff's employers within the meaning of the San Diego Municipal Code, § 39.0104.

151.   During the period of Ms. Hernández-García's employment with Defendants, the minimum wage in San Diego ranged from $8 to $12 per hour.  San Diego Municipal Code § 39.0107.

152.   Defendants were aware of or should have been aware of the requirement to pay Ms. Hernández-García the statutorily defined minimum wage for her labor.  Indeed, their work contracts for Ms. Hernández-García's employment in San Diego specified that they would pay her a regular rate of the municipal minimum wage.

153.   Defendants knowingly failed to compensate Ms. Hernández-García at the wage rate prescribed by law at the relevant times.

154.   Defendants' failure to pay Ms. Hernández-García the minimum wage was willful.

155.   As a result of Defendants' willful violations of the San Diego Municipal Code, Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, her unpaid wages, liquidated damages, and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial. San Diego Municipal Code § 39.0112.

## NINTH CLAIM FOR RELIEF

FAILURE TO PAY OVERTIME WAGES UNDER CALIFORNIA LABOR CODE

(CALIFORNIA LABOR CODE §§ 1194, 1198; IWC WAGE ORDER #15; SAN

DIEGO MUNICIPAL CODE § 39.0107)

(*AGAINST DEFENDANTS*)

156. Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

157. Under California Labor Code § 1194 and IWC Wage Order #15, Ms. Hernández-García was entitled to time and a half of the minimum wage for up to nine hours worked in excess of 45 hours per week. Ms. Hernández-García was entitled to double the minimum wage for all hours worked in excess of nine hours on the sixth and seventh workdays per week.

158. Defendants were Ms. Hernández-García's employers within the meaning of California Labor Code § 1182.12, IWC Wage Order #15, and San Diego Municipal Code § 39.0104. Defendants were therefore obligated to pay Ms. Hernández-García one and a half or two times, as relevant, the applicable minimum wage, which ranged from $8 to $12 per hour while she was employed by Defendants. California Labor Code §§ 1194, 1198; IWC Wage Order #15; San Diego Municipal Code § 39.0107.

159. The Penhos Defendants required Ms. Hernández-García to work approximately 14 to 18 hours per day, at least six days a week, in both their homes, but failed to pay Ms. Hernández-García any overtime wages.

160. Defendants were aware or should have been aware of the requirement to pay Ms. Hernández-García time and a half of the statutorily defined state and/or municipal minimum wages for hours worked in excess of 45 hours per week.

161. Defendants' failure to pay Ms. Hernández-García overtime wages was willful.

162. In addition, Defendants failed to maintain payroll or other records documenting wages earned, hours worked, and rest or meal periods taken by Ms. Hernández-García, in violation of IWC Wage Order #15.

163. As a result of Defendants' willful violations of the California Labor

-29-

ACTIVEUS 189746757v.4

Code, and IWC Wage Order #15, and the San Diego Municipal Code, Plaintiff is entitled to recover from Defendants, jointly and severally, her unpaid wages, and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.  Cal. Labor Code § 1194.

## TENTH CLAIM FOR RELIEF

FAILURE TO PROVIDE MEAL PERIODS UNDER CALIFORNIA LABOR CODE

(CALIFORNIA LABOR CODE §§ 226.7, 512; IWC WAGE ORDER #15)

(*AGAINST DEFENDANTS*)

164.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

165.   Under California Labor Code §§ 226.7 and 512 and IWC Wage Order #15, for every workday of more than five hours, Ms. Hernández-García was entitled to an uninterrupted half-hour meal period in which she was relieved of all duties. For every workday of more than ten hours, Ms. Hernández-García was entitled to a second uninterrupted half-hour meal period.

166.   Defendants were Ms. Hernández-García's employers within the meaning of California Labor Code § 1182.12 and IWC Wage Order #15.  Defendants were therefore obligated to provide Ms. Hernández-García with at least one, and often two, uninterrupted half-hour meal periods per workday in which she was relieved of all duties.

167.   Defendants failed to provide Ms. Hernández-García with uninterrupted meal periods.

168.   As a result of Defendants' violations of California Labor Code §§ 226.7 and 512 and IWC Wage Order #15, Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, one hour of pay for each workday that a meal period was not provided and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

-30-

ACTIVEUS 189746757v.4

**ELEVENTH CLAIM FOR RELIEF**

FAILURE TO PROVIDE REST PERIODS UNDER CALIFORNIA LABOR
CODE

(CALIFORNIA LABOR CODE § 226.7; IWC WAGE ORDER #15)

(*AGAINST DEFENDANTS*)

169. Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

170. Under California Labor Code § 226.7 and IWC Wage Order #15, Ms. Hernández-García was entitled to a ten-minute rest period for every four hours worked.

171. Defendants were Ms. Hernández-García's employers within the meaning of California Labor Code § 1182.12 and IWC Wage Order #15. Defendants were therefore obligated to provide Ms. Hernández-García with a ten-minute rest period for every four hours she worked.

172. Defendants failed to provide Ms. Hernández-García with rest periods.

173. As a result of Defendants' violations of California Labor Code § 226.7 and IWC Wage Order #15, Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, one hour of pay for each workday that a rest period was not provided and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

**TWELFTH CLAIM FOR RELIEF**

FAILURE TO PAY UPON TERMINATION

(CALIFORNIA LABOR CODE §§ 201-203)

(*AGAINST DEFENDANTS*)

174. Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

175. Under California Labor Code § 201, Ms. Hernández-García was entitled to be paid all earned and unpaid wages immediately upon her discharge.

-31-

176.   Defendants were Ms. Hernández-García's employers within the meaning of the California Labor Code and IWC Wage Order #15.  Defendants were therefore obligated to pay Ms. Hernández-García all earned but unpaid wages, resulting from Defendants' failure to pay Ms. Hernández-García the minimum wage and applicable overtime amounts, at the time she was terminated from their employment in or about June 2019.

177.   Defendants have not paid Ms. Hernández-García for all earned but unpaid wages.

178.   Defendants were aware or should have been aware of the requirement to pay Ms. Hernández-García all earned but unpaid wages immediately upon her termination.

179.   Defendants' failure to pay Ms. Hernández-García all earned but unpaid wages was willful.

180.   As a result of Defendants' knowing and intentional violations of California Labor Code § 201, Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, penalties allowed under California Labor Code § 203 and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

**THIRTEENTH CLAIM FOR RELIEF**

FAILURE TO REIMBURSE EXPENSES

(CALIFORNIA LABOR CODE § 2802)

(*AGAINST DEFENDANTS*)

181.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

182.   Under California Labor Code § 2802(a), Ms. Hernández-García was entitled to receive reimbursement from her employers for expenses incurred in the discharge of her duties.

183. Defendants were Ms. Hernández-García's employers within the meaning of the California Labor Code and IWC Wage Order #15. Defendants were therefore obligated to reimburse Ms. Hernández-García for her expenses incurred in the discharge of her duties.

184. Defendants have not reimbursed Ms. Hernández-García for her expenses incurred, including but not limited to those incurred when out of the house with the children.

185. Defendants were aware of or should have been aware of the requirement to reimburse Ms. Hernández-García for such expenses.

186. Defendants' failure to reimburse Ms. Hernández-García for her expenses was willful.

187. As a result of Defendants' knowing and intentional violations of California Labor Code § 2802, Ms. Hernández-García is entitled to recover from Defendants, jointly and severally, her unreimbursed expenses, and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

### FOURTEENTH CLAIM FOR RELIEF
### BREACH OF CONTRACT, CALIFORNIA COMMON LAW
### (*AGAINST DEFENDANTS*)

188. Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

189. Defendants employed Ms. Hernández-García under annual contracts that purported to set out the terms of her employment and that were annually renewed by Defendant Isaac Penhos Dana.

190. Defendants Isaac Penhos Dana and Esther Sutton de Sacal provided Ms. Hernández-Garcia with annual contracts to submit to the U.S. Embassy in support of her B-1 visa application to come to the United States as a domestic worker.

191. These annual contracts stipulated that Ms. Hernández-García would

-33-

earn the highest of the federal, state, or local minimum wage.  Between 2012 and 2019, the promised salary ranged between $7.67 and $13.43 per hour.  Later annual contracts also stated that Ms. Hernández-García would work Monday to Friday from 9 a.m. to 5 p.m., for a 40-hour workweek.  Under the terms of these annual contracts, overtime hours (those in excess of 40 hours weekly) would be compensated at 150% of the base hourly salary.

192.   Under the terms of these annual contracts, Ms. Hernández-García was entitled to medical insurance, food, and lodging in addition to her hourly wage, as well as a round trip journey to her home in Mexico on an annual basis.

193.   Ms. Hernández-García relied on the representations in these annual contracts to inform her decision to move to the United States.  She fulfilled the terms of these agreements by working in excess of the promised hours, and was forced repeatedly to work overtime hours.

194.  Defendants paid Ms. Hernández-García far less than her stated contractual wage and paid her no overtime wages at all.

195.   While Defendants provided Ms. Hernández-García with a room, in Miami she had to share a room with the Penhos Defendants' son, and in San Diego she had to share a room with other house staff, which initially could not be locked, thus offering her no privacy.

196.   Defendants provided Ms. Hernández García with almost no food and she had to subsidize her own meals from her meager earnings.

197.   Defendants failed to provide Ms. Hernández García with medical insurance, leaving her to both beg unsuccessfully for time off when she had medical issues and to cover the costs of her treatment out of pocket.

198.   While Defendants paid for her travel between San Diego, California, and Mexico City, Mexico, on an annual basis, they did not cover the travel costs between Mexico City—a sprawling metropolis—and Ms. Hernández-García's home in another state.

-34-

COMPLAINT
Case No.

199.   Ms. Hernández-García was forced to work long hours under grueling conditions at wages far below those guaranteed in her annual contracts and to pay from her own meager earnings costs that Defendants were contractually bound to cover for her.

200.   As a result of Defendants' breach of these annual written contracts, Ms. Hernández-García suffered significant economic harm and should be compensated for this loss, in amounts to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF

### VIOLATIONS OF UNFAIR COMPETITION LAW

(CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*)

(*AGAINST DEFENDANTS*)

201.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

202.   The California Business & Professions Code, §§ 17200, *et seq.* prohibits unfair competition, including through any unlawful, unfair, or fraudulent business act or practice.

203.   Defendants improperly, fraudulently, and unlawfully (a) failed to pay minimum and overtime wages to Ms. Hernández-García as required by federal, California and San Diego municipal law; (b) failed to provide Plaintiff with accurate written statements of her wages earned, hours worked, and deductions as required by California law; and (c) failed to provide meals and rest periods to Plaintiff as required by California law.   These violations serve as unlawful, unfair, and/or fraudulent acts and practices for purposes of Cal. Bus. & Prof. Code § 17200.

204.   Plaintiff has suffered injury and lost money as a result of Defendants' unlawful, unfair, and/or fraudulent acts and practices and, as such, is entitled to bring civil action against them for their unfair competitive practices.   Cal. Bus. & Prof. Code § 17204.

205.   As a result of Defendants' violations of California Bus. & Prof. Code

-35-

ACTIVEUS 189746757v.4

§§ 17200 *et seq.*, Plaintiff is entitled to recover from them, jointly and severally, remedies or penalties allowed under §§ 17200 *et seq.* and reasonable attorneys' fees and costs, including pre- and post-judgment interest, in amounts to be proven at trial.

## SIXTEENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT, CALIFORNIA COMMON LAW

### (*AGAINST DEFENDANTS*)

206.   Ms. Hernández-García re-alleges and incorporates each of the foregoing paragraphs by reference.

207.   In the alternative to breach of contract, should the written contract between Plaintiff and Defendants be found to be unenforceable, Plaintiff alleges that Defendants were unjustly enriched by her labor.

208.   Defendants received a financial benefit by accepting Ms. Hernández-García's labor while paying her at a rate far below the applicable minimum wage, and this benefit was at Ms. Hernández-García's expense because she received subminimum wages for her labor.

209.   It would be unjust for Defendants to retain the money they saved by undercompensating Ms. Hernández-García because they obtained the benefit of her labor through fraud, coercion, and/or the conscious interference of her legally protected interests.

210.   As a result of Defendants' unjust enrichment, Ms. Hernández-García is entitled to restitution, in amounts to be proven at trial.

## VII.   DEMAND FOR JURY TRIAL

211.   Ms. Hernández-García requests a trial by jury.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Ms. Hernández-García respectfully prays that this Court:

1.  Enter judgment in her favor in each and every cause of action asserted in the Complaint;

-36-

COMPLAINT
Case No.

2.  Award such damages as may be appropriate, including compensatory, punitive and liquidated damages;

3.  Award Ms. Hernández-García her attorneys' fees and costs;

4.  Award Ms. Hernández-García pre- and post-judgment interest; and

5.  Award any such other and further relief as the Court deems just and proper.

-37-

COMPLAINT
Case No.

DATED this September 23, 2021.

Respectfully submitted,

WILMER CUTLER PICKERING HALE AND DORR LLP

*/s/ Christopher T. Casamassima*

Christopher T. Casamassima
Andrew Shipley
Leslie A. Harrelson
Chavi Keeney Nana

CENTRO DE LOS DERECHOS DEL MIGRANTE, INC.

Benjamin Botts
Melanie A. Stratton

*Attorneys for Plaintiff*

-38-

ACTIVEUS 189746757v.4